## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JAMES RONALD BAKER, et al.,** | : | **Case No.  1:14cv00512** |
| | : | **(J. Dlott)** |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **CITY OF PORTSMOUTH, OHIO, et al.,** | : | |
| | : | |
| **Defendants** | : | |

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, CITY OF PORTSMOUTH, OHIO, CHRISTOPHER S. SMITH, HEALTH COMMISSIONER, CITY OF PORTSMOUTH, AND ANDREW L. GEDEON, DIRECTOR OF ENVIRONMENTAL HEALTH, CITY OF PORTSMOUTH, OHIO, AND IN HIS INDIVIDUAL CAPACITY**

The Defendants, City of Portsmouth, Ohio, Christopher S. Smith, Health Commissioner, City of Portsmouth, Ohio, and Andrew L. Gedeon, Director of Environmental Health, City of Portsmouth, Ohio, move this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the grounds that there is no genuine issue as to any material fact and the Defendants are entitled to judgment as a matter of law.  This Motion is supported by the Memorandum set forth below, the Affidavit of Christopher S. Smith (attached hereto as Exhibit 1), the discovery responses of the defendants (attached hereto as Exhibit 2), and the depositions filed herein (excerpts attached hereto as Exhibits 3 through 7).

Respectfully submitted:

*/s/ John W. Hust*

Lawrence E. Barbiere, Ohio Bar Number: 0027106
John W. Hust, Ohio Bar Number: 0027121
***Trial Attorneys for the Defendants***
*SCHROEDER, MAUNDRELL, BARBIERE & POWERS*
5300 Socialville-Foster Road, Suite 200
Mason, OH 45040
(513) 583-4200 / (513) 583-4203 (fax)
lbarbiere@smbplaw.com / jhust@smbplaw.com

<u>**MEMORANDUM**</u>

I.     <u>**STATEMENT OF FACTS**</u>

In late 2012, the City of Portsmouth, Ohio ("the City") adopted a rental dwelling code which took effect on January 3, 2013.  (Doc. 1, Complaint, ¶¶ 28-29, and Ex. A).  The stated purpose of the Code is "to protect the public health, safety and welfare of occupants in all rental dwellings ..."  The Code required landlords to apply for a rental dwelling permit for each rental property.  Thereafter, an inspection of the rental premises was scheduled with a minimum of forty-eight (48) hours notice.  (Doc. 1, Complaint, Ex. A).

Christopher S. Smith, the City's Health Commissioner, has the overall responsibility for ensuring the periodic inspection of rental dwellings within the City subject to the Ordinance.  (Ex. 1, Smith Affidavit, ¶¶ 1-2).  In his deposition testimony, Mr. Smith explained the operation of the inspection and permitting operation of the Code as follows:

> "MR. SMITH: And I can take it -- he's got a leaky basement.  I do an inspection.  I tell you to fix it.  I give you two months to fix it.  I come back in two months.  It's not fixed.  Therefore, I'm going to actually send you a letter saying notice of violation.  Saying you have to fix this by -- in two more months.  Then if you still haven't fixed it, then I'm going to issue a notice to come before the health commissioner.  You're going to come before the health commissioner.  We're going to discuss it.  I'm going to say, well, you know, will you fix it?  The person says, yeah, I'll fix it.  We're going to set another date.  If they don't fix it at that point, then we bring them before the board to revoke their permit.  And the board of health has another option to give them more time to fix it, or -- you know, depending on what the person says.  If the board of health gives them time, they still don't fix it.  At that point, the board of health can revoke their -- their permit.  Revoke their permit.  And at that point, the landlord doesn't have to  continue renting.  So if he don't want to fix his basement, he doesn't have to.  But if he doesn't -- if he continues to rent it with the leaky basement and without the permit, then he's going to be in violation of the ordinance.  And we have the ability then to issue him a citation into court not for the leaky basement.  We are going to cite him into court for operating without a permit.

2

MR. THOMPSON:  Okay.  I understand.
MR. SMITH:  And then the judge then will do whatever the judge does."

(Ex. 3, Smith Dep., pp. 71-72).

Being an older city, much of the City's housing stock is aging.  The median year for home construction in Portsmouth is 1948.  The median year for home construction in Ohio is 1965 and the median year for home construction for the United States is 1975.  (Ex. 1, Smith Affidavit, ¶ 3). The City was hard-hit by the recession and financial crisis in 2008 and forward.  Many formerly owner-occupied single-family homes, as well as rental properties, were foreclosed upon and/or abandoned and later became rental properties.   Many of these buildings sat unoccupied for an extended period of time, which left them vulnerable to theft and vandalism.  The City has no idea if these properties have been repaired to the code standards.  Prior to the adoption of the rental permit program, a majority of the complaints regarding building code compliance matters received by the City related to rental units.  Smith, in his capacity as Health Commissioner, has found that many families are living in un-safe and unsanitary conditions.  Many are afraid to complain, as they fear eviction or retaliation by their landlord.  Many also are unaware of their legal rights under Ohio's landlord-tenant statute and the City's ordinances.  (Id.).

During the first year of the program, the owners of the properties were given approximately one (1) year to correct any non-critical failures that did not pose an immediate danger to the health or safety of the tenant(s).  Those failures noted on the inspection form.  Inspection items deemed critical were given a time period for correction on the inspection form.  If a follow up inspection was required for the critical deficiencies or failures, the re-inspection date was noted on the inspection form.   (Id., Ex. B).  Each

3

Plaintiff acknowledged that this was the process they experienced.  (Ex. 4, Baker Dep., pp. 15-16; 22-24; Ex. 5, Howard Dep., pp. 13-14; Ex. 6, Oliver Dep., pp. 9-12; Ex. 7, Ross Dep., pp. 11-16).

No property owners were cited for violations for the rental inspection program. (Ex. 1, Smith Affidavit, ¶ 5).  The letter attached to Plaintiffs' Complaint as Exhibit B entitled "Failure to Schedule Mandatory Rental Inspection" was sent to property owners only after the property owners failed to respond to contacts from the City to schedule inspections. (Id.).  Only Plaintiff, Ronald Baker ever received one of these letters. However, he was not cited or prosecuted.  There were no "surprise" inspections for the property owners.  Section 1361.02(A) of the ordinance provides that the inspections are conducted on a minimum of forty-eight (48) hours notice, unless the time period was waived by the tenant or occupant. The inspections were limited to the items on the checklist.  (Ex. 1, Smith Affidavit, ¶ 6 and Ex. C).  The purpose of the inspections was to determine whether the property complies with the City's property maintenance codes.  (Id.).

As stated in the Ordinance, section 1361.01, its purpose "is to protect the public, health, safety and welfare of occupants in all rental dwellings as hereinafter provided by inspection and enforcement of the International Property Maintenance Code and the Codified Ordinances of the City of Portsmouth, fixing the responsibilities of owners, operators and occupants of all rental dwellings and providing for the administration of the Rental Dwelling Code."  (Ex. 1, Smith Affidavit, ¶ 7).

A review of the inspection reports shows that virtually every unit owned by the Plaintiffs failed some portion of the items on the dwelling inspection checklist.  Failure included missing and/or inoperative smoke detectors and carbon monoxide detectors.

4

Other defects included defective kitchen appliances, HVAC problems, missing handrails, roach infestations and bathroom fixture defects.  (Ex. 1, Smith Affidavit, Ex. B).

Inspections are necessary to further the stated purposes of the ordinance, i.e., to protect the public health, safety and welfare of occupants of all rental buildings, in the following respects:

(a)  inspections merely ensure that the Codes which have been in place for decades are actually enforced, as the sub-par state of the housing stock in the City demonstrates that the Codes, without inspections to ensure compliance, are essentially worthless and leave tenants at risk of living in dangerous and/or unhealthy conditions;

(b)  the Ordinance was designed to encourage compliance with the property maintenance code by owners, and without periodic and scheduled inspections the incentive to comply is not present;

(c)  search warrants are useful only if violations are visible from the public right-of-way or are based upon other credible information;

(d)  conditions inside the premises are not readily visible from the street and would not support a warrant unless the occupant of the building either provided information to support a warrant, or the occupant of the building permitted an inspection;

(e)  tenants include some of the poorest and most vulnerable citizens of the City and are frequently unaware of their rights under Ohio's landlord-tenant laws and are either uninformed of their right to complain of sub-standard conditions on the premises, or fear retaliation from landlords, and are therefore reluctant to report problems to the City.  Without the ability to schedule and conduct periodic inspections of the rental properties, the purpose of the ordinance will be frustrated and the benefits of the ordinance in terms of public health and safety will be significantly diminished.

(Ex. 1, Smith Affidavit, ¶ 8).

Each of the Plaintiff property owners acknowledge that their tenants have the right to receive visitors and invite people onto the premises without their consent.  Likewise, they acknowledge that as landlords they have the right to enter the premises upon giving the tenant(s) reasonable notice, i.e., usually 48 hours.  (Ex. 4, Baker Dep., pp. 32-33; Ex. 5,

Howard Dep., p. 18; Ex. 6, Oliver Dep., p. 17; Ex. .7, Ross Dep., pp. 21-22). (The Ordinance provides 48 hours notice, Ex. 1, Smith Affidavit, ¶ 6).

## II.    ARGUMENT OF LAW

Plaintiffs' Complaint (Doc. No. 1) alleges the Ordinance unconstitutionally conditions the receipt of a benefit, i.e., a rental permit, upon an agreement by the property owner to consent to a warrantless search. Plaintiffs also allege the Ordinance violates their equal protection rights under the Fourteenth Amendment, apparently premised on the fact that the rental permit program applies only to single family rental dwellings and not owner-occupied single family dwellings, and treats some multi-family rental units differently than single family rental units. Finally, Plaintiffs' third claim alleges a state law claim of unjust enrichment and seeks return of the fees paid by the Plaintiffs in connection with the rental dwelling permit program.

### A.    Renting Residential Premises Is a Closely Regulated Business and a Search Warrant Is Not Required for Inspections.

### 1.    The closely regulated business exception.

The Supreme Court has long recognized that warrantless inspections of closely regulated business premises are permissible under the Fourth Amendment. See, *Colonnade Corp. v. United States*, 397 U.S.72, 90 S.Ct.774, 25 L.Ed.2d 60 (1970); *United States v. Biswell*, 406 U.S.311, 92 S.Ct.1593, 32 L.Ed.2d 87 (1972).

In *New York v. Burger*, 482 U.S.691, 699, the Court stated:

> "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home. ... This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries. The Court observed in *Marshall v. Barlow's, Inc.*: 'Certain industries have such a history of government

6

oversight that no reasonable expectation of privacy ... could exist for a proprietor over the stock of such an enterprise.' 436 U.S. at 313, 98 S.Ct., at 821."

The landlord-tenant relationship has long been the subject of close regulation by the state of Ohio. Ohio's landlord-tenant statute was passed in 1974, nearly forty years ago. The statute closely regulates all aspects of the landlord-tenant relationship from permissible and impermissible contractual terms, detailed obligations on the part of the landlord to keep the property habitable, and limitations upon court remedies. Courts within the Sixth Circuit have found such diverse industries as barbershops, pet shops and convenience stores to be closely regulated. See, *Stogner v. Kentucky,* 638 F.Supp.1 (W.D. Ky.1985) (barbershops); *United Pet Supply, Inc. v. City of Chattanooga*, 921 F.Supp.2d 835 (E.D. Tenn.2013) (pet shops); and *Midwest Retailer Associated, Ltd. v. City of Toledo*, 563 F.Supp.2d 796 (N.D. Ohio 2008) (convenience stores). As the Court observed in *Amvets Post No. 711 v. Rutter*, 863 F.Supp.2d 670, 673 (N.D. Ohio 2012):

> "The Supreme Court has held, however, that when the business at issue is 'closely or pervasively regulated,' legislative schemes that provide for warrantless administrative inspections can be permissible. ... The Court has reasoned that an 'owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy[.]' Thus, 'where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.'"

In addition to the long history of close regulation, the landlord and tenant both have a diminished expectation of privacy. The landlord has turned over to the tenant possession and control of the premises. Plaintiffs testified they recognized that a tenant is free to invite anyone to enter the premises. Plaintiffs acknowledge the tenant's expectation of privacy is diminished, as the statute recognizes the landlord's right to enter the premises for a

7

multitude of purposes, including "inspection". R.C. 5321.05(A)(5). (Ex. 4, Baker Dep., pp. 32-33; Ex. 7, Ross Dep., pp. 21-22; Ex. 6, Oliver Dep., p. 17; and Ex., 5, Howard Dep., p. 18).

**2.** **Rental of residential property is a closely regulated business.**

Enacted in 1974, Chapter 5321 closely regulates: (1) the contractual relationship between the landlord and tenant, including permissible and impermissible terms of that relationship; (2) the obligations of the landlord to keep the property in a fit and habitable condition; (3) rent withholding procedures; and (4) retaliatory conduct of the landlord. In addition, the Act requires a landlord to comply with the rights of tenants under the Servicemembers Civil Relief Act, 50 U.S.C.A. §501 et seq. See, R.C.5321.03(A)(10). As discussed below, the law also imposes significant obligations on the tenant.

**a.** **Regulation of the contractual relationship.**

R.C.5321.13 prohibits certain terms in rental agreements:

- no provision of the law may be modified or waived by any oral or written agreement;
- a rental agreement may not include a warrant of attorney to confess judgment;
- a rental agreement may not contain an agreement to pay the landlord's attorney's fees;
- a rental agreement may not contain an agreement by a tenant to exculpation or limitation of any liability of the landlord arising under law, or to indemnify the landlord for that liability;
- a rental agreement cannot contract a way the duties imposed upon the landlord under R.C.5321.04.

R.C.5321.14 permits courts to refuse to enforce unconscionable terms of rental agreements, or to refuse to enforce the entire agreement. R.C. 5321.15 prohibits a landlord from certain self-help remedies, including:

8

- the landlord may not terminate utilities or other services, exclude the tenant from the premises, or threaten any unlawful act against a tenant for purposes of recovering possession of the rental premises;
- the landlord is prohibited from seizing the furnishings or possessions of a tenant for purposes of recovering rental payments, other than in accordance with a court order.

R.C.5321.16 governs security deposits and among other provisions, requires the following:

- payment of interest on the security deposit;
- limits the right of a landlord to apply the security deposit to such things as the past due payment of rent or to the payment of damages suffered by reason of the tenant's non-compliance with R.C.5321.05;
- deductions from the security deposit must be itemized and identified by the landlord in a written notice delivered to the tenant, together with the amount due within thirty days after termination of the rental agreement and delivery of possession, and the tenant may recover the property and money due him together with damages in an amount equal to the amount wrongfully withheld and reasonable attorney's fees.

R.C.5321.17 prescribes the methods by which the landlord or tenant may terminate or fail to renew a tenancy. It specifies the manner in giving notice to terminate a tenancy.

Finally, R.C. 5321.18 requires written rental agreements to contain certain information about the parties, including *inter alia*, the name and address of the owner and the name and address of the owner's agent, if any. If the rental agreement is oral, the landlord is required to provide this information by written notice at the time of the commencement of the tenancy. Failure to give this notice relieves a tenant of an obligation to provide the notice as required by 5321.07(A) and 5321.08(A).

**b.** **Obligations of the landlord.**

In addition to the regulation of the contractual relationship, R.C. 5321.04 also imposes the following specific obligations upon a landlord:

(1)     Comply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety.

(2)     Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition;

(3)     Keep all common areas of the premises in a safe and sanitary condition.

(4)     Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by the landlord.

(5)     When the landlord is a party to any rental agreements that cover four or more dwelling units in the same structure, provide and maintain appropriate receptacles for the removal of ashes, garbage, rubbish, and other waste incidental to the occupancy of a dwelling unit, and arrange for their removal.

(6)     Supply running water, reasonable amounts of hot water, and reasonable heat at all times, except where the building that includes the dwelling unit is not required by law to be equipped for that purpose, or the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant and supplied by a direct public utility connection.

(7)     Not abuse the right of access conferred by division (B) of section 5321.05 of the Revised Code.

(8)     Except in the case of emergency or if it is impracticable to do so, give the tenant reasonable notice of the landlord's intent to enter and enter only at reasonable times. Twenty-four hours is presumed to be a reasonable notice in the absence of evidence to the contrary.

(9)     Promptly commence an eviction action where the landlord has knowledge of violations by the tenant of certain laws, including drug abuse laws.

(10)    Comply with the rights of tenants under the Servicemembers Civil Relief Act, 117 Stat. 2835, 50 U.S.C. App. 501.

The City's rental property inspection program mirrors and supports the obligations imposed upon landlords by Ohio law.

### c.     A tenant can withhold rent from a non-compliant landlord.

The Ohio statute regulates the landlord's most fundamental interest, i.e., the right to receive rent. R.C.5321.07. A tenant may withhold rent where the tenant has

delivered written notice to the landlord of his non-compliance with the requirements of §5321:

- the landlord fails to fulfill any obligation imposed upon him by section 5321.04 of the Revised Code;
- the landlord fails any obligation imposed upon him by the rental agreement;
- if the conditions of the residential premises are such that the tenant reasonably believes that a landlord has failed to fulfill any such obligations;
- if a governmental agency has found that the premises are not in compliance with building, housing, health, or safety codes that apply to any condition of the premises that could materially affect the health and safety of an occupant.

R.C.5321.07(B) requires a landlord, within a "reasonable time" or within thirty days, whichever is sooner, to remedy the condition.  If the landlord fails to timely remedy the condition, the tenant can do one of the following:

- deposit all rent that is due and thereafter becomes due the landlord with the clerk of the municipal or county court having jurisdiction in the territory in which the residential premises are located;
- apply to the court for an order directing the landlord to remedy the condition and as a part of that application, deposit the rent with the clerk of court;
- apply for orders reducing the periodic rent due the landlord;
- apply for an order reducing the rent due the landlord until the landlord remedies the condition, or apply for an order to use the rent deposited with the court to remedy the condition;
- terminate the rental agreement.[1]

**d.      Tenant's obligations.**

Chapter 5321 significantly regulates the tenant's rights and obligations.  R.C. 5321.05 imposes the following obligations upon tenants:

---

[1]  5321.07(C) provides that this section applies to any landlord who is a party to rental agreements that cover four or more dwelling units.  In this case, each of the Plaintiffs have four or more dwelling units.

- comply with all applicable state and local housing, health, and safety codes that impose requirements on tenants
- keep that part of the premises which he occupies safe and sanitary
- dispose of all garbage and waste in a clean, safe and sanitary manner
- keep all plumbing fixtures in the unit used by the tenant as clean as their condition permits and use and operate all electrical and plumbing fixtures properly
- maintain in good working order and condition any appliances supplied by the landlord and required to be maintained by the tenant under the terms of the written lease
- refrain from and forbid any person on the premises with tenant's permission from destroying, defacing, damaging or removing any part of the premises, fixtures, or appliances
- not allow drug-related activity and prohibited in Chapter 2925 and Chapter 3719 of the Revised Code, or any similar municipal ordinances
- not disturb the peaceful enjoyment of the premises by neighbors
- not unreasonably withhold consent for the landlord to enter the premises for inspection, repair, alterations, or improvements, large parcel delivery too large for the tenant's mail facilities, supply or necessary or agreed services, or showing the unit to prospective or actual buyers, mortgagees, tenants, workmen, or contractors
- not allow occupancy of the premises by any sex offender or child-victim offender prohibited from establishing residence within 1000 feet of any school or child daycare center

As in the case of landlords, the rental inspection permit program supports the objectives of Ohio's landlord-tenant statute.

### e.  <u>Both the landlord and the tenant have a diminished expectation of privacy.</u>

"Both federal and state courts consistently have held that a landlord has no reasonable expectation of privacy in premises occupied by a tenant and thus cannot successfully challenge under the Fourth Amendment the search or inspection of such property." *Godshalk v. Borough of Bangor*, 2003 WL 23905204 (E.D. Pa.2003), citing inter alia, *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir.1994) (finding no §1983 claim arose from search of property that owner vacated and in which she thus lacked reasonable

expectation of privacy). See also, *Marcavage v. Borough of Landsdowne, PA,* 826 F.Supp.2d 732, (E.D. Pa.2011), *affm'd,* 493 Fed.Appx.301, 306 (3rd Cir.2012).

Here, the Ohio landlord-tenant statute diminishes the expectation of privacy of both the landlord and the tenant. The landlord must provide reasonable notice to the tenant of the landlord's intent to enter the premises and must enter only at reasonable times. R.C.5321.04(A)(8). Similarly, the tenant is required to "not unreasonably withhold consent for the landlord to enter into the dwelling unit in order to inspect the premises, make ordinary, necessary, or agreed repairs, declarations, alterations, or improvements, deliver parcels that are too large for the tenant's mail facilities, supply necessary or agreed services, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors." Among the multitude of reasons the landlord may enter the premises, is the right to enter in order to "inspect". The statute imposes a mutual obligation on the landlord and tenant to maintain the property in compliance with all state and local housing, health, and safety codes. See, R.C. 5321.04(A)(3); R.C. 5321.05(A)(5). Here, each Plaintiff acknowledges a tenant's right to admit visitors to the property and a landlord's right to enter upon reasonable notice.

### f.    Landlords are subject to federal regulation.

R.C.5321.04, which enumerates many of the landlord's obligations under Ohio law, also incorporates by reference a federal statute, the Servicemembers Civil Relief Act, 50 App. U.S.C.A. §501 et seq. 50 App. U.S.C.A. §531 places restrictions on a landlord's ability to evict a servicemember or dependents. 50 App. U.S.C.A. §535 governs the termination of residential leases of a servicemember.

13

Landlords also can be subject to regulation under the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. 4852d.  The obligations include notice to potential lessees regarding lead paint hazards in pre-1978 housing and the use of EPA certified contractors.

Finally, all the Plaintiffs have participated in the federal government's Section 8 housing program, which has mandatory inspection requirements.

### 3.    **The City's rental inspection program satisfies the _Burger_ criteria for warrantless inspections**.

The Supreme Court in _Burger_ said that warrantless inspections must be "reasonable" and established three criteria by which to judge reasonableness:

> "First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made".
>
> \* \* \* \*
>
> "Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme'.
>
> \* \* \* \*
>
> "Finally, 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' ...  In other words, the regulatory statute must perform the two basic functions of the warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."

482 U.S. at 702-03.

There can be no doubt that the first criteria of _Burger_ is met.  Building, safety and health codes have long been recognized as legitimate governmental purposes that promote the public health, safety and welfare.  Ohio's landlord-tenant statute recognizes these as legitimate governmental purposes, as does Ohio's search warrant statutes related to searches of buildings.  See, R.C. 2933.21 and 2933.22.  See also, R.C. 3781.10

14

(adoption of state residential building code); R.C. 3737.22 (adoption of state fire code). In *Chernin v. Welchans*, 844 F.2d 322, 329 (6th Cir.1988), the Sixth Circuit recognized the strong governmental interest in regulating the landlord-tenant relationship. The Court, in reviewing an earlier version of the rent withholding procedures, stated:

> "In the instant case, the policy that the state action advances is that of ensuring that adequate housing conditions exist in Ohio. The challenged statute is designed to protect the health and welfare of the tenants of rental properties. The statute directly serves the state's interest in the health and welfare of its citizens. Such an interest is clearly substantial."

The Sixth Circuit also observed that: "Balanced against the landlord's interest in the prompt receipt of his rent is the tenant's right to live in fit and habitable conditions, an interest with great weight." 844 F.2d at 327. In this case, the rental inspection permit ensures advancement of those purposes where the occupant of the building does not own the building and the owner is absentee.

The second requirement of *Burger* is that warrantless inspections must be necessary to further the regulatory scheme. Absent periodic scheduled inspections, the City will be severely limited in its ability to effectively enforce its property maintenance code with reference to rental properties. Given many tenants' reluctance to file complaints for fear of retaliation by their landlord, and their frequent lack of knowledge regarding their rights to complain of building code violations, the City would only able to proceed against the most obvious and worst violations apparent from the public street. (Ex. 1, Smith Affidavit, ¶ 8).

Finally, the City's rental permit Ordinance satisfies the third requirement of *Burger* that it meet the two basic functions of a warrant, i.e., "advise the owner of the commercial premises that the search is being made pursuant to the law and [have] a properly defined

15

scope, and it must limit the discretion of the inspecting officers."   The Ordinance clearly provides the owner of rental property notice that the search is being made pursuant to law, i.e., the Ordinance, and its scope is proper, i.e., limited to determining compliance with the City's property maintenance code.   The inspections are scheduled in advance.   If the property is occupied, the inspection is scheduled at a time convenient to both the owner and the tenant.   The City does not conduct unannounced or surprise inspections.  (Ex.1, Smith Affidavit, ¶¶ 5-7).   The scope of an inspection is specifically defined by the building inspection checklist.   In other words, the building inspector's discretion is limited to confirming compliance with specific items of the building maintenance code.

## B.   <u>Equal Protection</u>

Count II of Plaintiffs' Complaint alleges the Ordinance violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution because it applies only to single family rental dwellings and does not apply to owner-occupied single family dwellings in the City, and because it treats multi-unit rental dwellings differently than single unit rental dwellings.

Plaintiffs must establish that the Ordinance "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the constitution."   *San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S.1, 17, 93 S.Ct.1278, 36 L.Ed.2d 16 (1973).  If it does, then the Ordinance must be examined with strict scrutiny, if not then the framework for the analysis is whether the Ordinance "rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the equal protection clause of the Fourteenth Amendment."   Id.   The Sixth Circuit has held that a rational basis exists for

16

singling out rental property for regulation. *Harris v. City of Akron*, 10 Fed.Appx.316, 320 (6th Cir.2001). See also, *Pennell v. City of San Jose*, 485 U.S.1 (1988)(holding that the city's rent control ordinance did not violate due process or equal protection).

Plaintiffs' claim an equal protection violation because the Ordinance regulates only single family rental units and does not include multi-family or owner-occupied homes. The logic of this argument was rejected by the Supreme Court in *Railway Express Agency, Inc. v. New York*, 336 U.S.106, 110 (1949), where the Court observed: "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."

In *Berry v. City of Little Rock,* 904 F.Supp.940 (E.D. Arkansas 1995), plaintiffs sued the city alleging that an ordinance requiring "a program of systematic city wide inspection of rental housing units violated the equal protection clause because owner occupied structures or higher income rental structures were not systematically inspected and there was no rational basis for the disparate treatment of the plaintiff owner as compared to owner occupiers." 904 F.Supp. at 944. The court rejected plaintiffs' claim stating that: "Neither owners/landlords nor low income property owners are a 'suspect class' in this action. Therefore, the city need only show that the Ordinance is rationally related to a legitimate state interest." 904 F.Supp. at 948. The court found that the ordinances were "designed to serve the legitimate purpose of insuring that rental housing was being maintained in code compliance in order to protect the health, safety and welfare of the tenants." Id.[2] The court further noted that: "The application of the ordinance to rental properties as opposed to owner occupied properties is a reasonable way of utilizing limited

---

[2] It is of note that the court in the *Berry* case used the same language which Plaintiffs contend is "vague".

17

enforcement resources and concentrating enforcement activities where they are likely to be needed." 904 F.Supp. at 949.  The court concluded by stating: "In fact, in the area of social welfare a municipality may address a problem one step at a time or select one phase of one field and apply a remedy there, neglecting others." Id.  (Ex. 3, Smith Dep., pp. 21-22; 27-28).  Accordingly, Plaintiffs' claim that the City's Ordinance violates equal protection should be rejected.

C.    **Qualified Immunity**

Assuming arguendo that Plaintiffs' Complaint names Smith and Gedeon in their individual capacities, they are entitled to qualified immunity to the extent they have been sued in their individual capacities.  Qualified immunity "shields government officials performing discretionary functions...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (citing *Harlow v. Fitzgerald*, 475 U.S. 800, 818 (1982)).  To determine whether qualified immunity is warranted, a court must ask (1) whether the alleged facts, taken in a light most favorable to the party asserting the injury, show that the officials conduct violated a constitutional right; and (2) whether the constitutional right was clearly established in the specific context so that a reasonable official would understand that he is violating that right.  *Saucier v. Katz*, 533 U.S.194, 202 (2001).  The Court need not address these steps in any particular order, nor must the Court address both steps if the plaintiff makes an insufficient showing on one.  *Pearson v. Callahan*, 555 U.S.223 (2009).

18

Whether a defendant is entitled to qualified immunity is purely a legal question. *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994). Plaintiffs bear the burden of alleging specific facts to overcome the defense of qualified immunity. *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir.2006). A government official will be liable for the violation of a constitutional right only if the right was "'clearly established ... in light of the specific context of the case.'" *Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir.2010) (quoting *Scott*, 550 U.S. at 377, 127 S.Ct. 1769). A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, "there are 'limitations upon the extent to which a court may rely on holdings in contexts other than the one being considered to demonstrate that a principle has been clearly established.' " *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1176 (6th Cir. 1988)). Plaintiffs must show that at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S.Ct. 2074, 2080 (2011).

The issue of whether the closely regulated business exception applies to residential rental property appears to be a case of first impression. Counsel was unable to locate any case holding that the closely regulated business exception does not apply to residential rental property. Counsel located one case where the District Court considered the exception in the context of a rental permit/inspection ordinance. *Brower v. Village of Bolingbrook,* 735 F.Supp.768 (N.D. IL 1990). In *Brower*, the Court overruled the village's

motion to dismiss plaintiff's Fourth Amendment claim based upon the closely regulated business exception because there was insufficient evidence in the record to satisfy the second and third requirements of *Burger*.  Given the many contexts in which the closely regulated business exception is applied, it certainly cannot be said that every reasonable official would conclude that the landlord-tenant business is not a closely regulated business.

###     D.     Unjust Enrichment

Under Ohio law, the City, as a political subdivision of the State, cannot be bound under a theory of implied, or quasi-contract such as unjust enrichment. *Rootstown Twp. Trustees v. Rootstown Water Svc. Co.,* 11th Dist. No.2011-P-0084, 2012-Ohio-3888, ¶ 49, citing *Kraft Constr. Co. v. Cuyahoga Cty. Bd. Of Commr's.*, 128 Ohio App.3d 33, 44, 713 N.E.2d 1075 (8th Dist.1998).  In addition, the City is immune from any liability under chapter 2744 of the Revised Code for its actions in performing a governmental function such as enforcing building ordinances.

Plaintiffs' Complaint cites *Santos v. Ohio Bur. of Workers' Compensation*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441 in support of their claim.  That case is inapposite. The Supreme Court held that a suit for return of funds wrongly collected or held *by the state* is brought in equity and jurisdiction is not exclusive to the court of claims.  The Court also observed that: "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.", quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002).  Here, Plaintiffs seek damages from the Defendants

individually.

Defendants also are entitled to summary judgment on this claim for the simple reason that Plaintiffs have not established any violation of their Fourth Amendment rights, or any violation of the equal protection clause.  For that reason, the Court should enter summary judgment in favor of the Defendants as to this claim.  In the alternative, the Court could decline to exercise supplemental jurisdiction over this claim.

III.    **CONCLUSION**

For all the above reasons, the Defendants respectfully request this Court to enter summary judgment in their favor.

Respectfully submitted:

/s/ John W. Hust
Lawrence E. Barbiere, Ohio Bar No.: 0027106
John W. Hust, Ohio Bar No.: 0027121
***Trial Attorneys for Defendants***
SCHROEDER, MAUNDRELL, BARBIERE & POWERS
5300 Socialville-Foster Road, Suite 200
Mason, OH 45040
(513) 583-4200
(513) 583-4203 (fax)
lbarbiere@smbplaw.com
jhust@smbplaw.com

21

## <u>CERTIFICATE OF SERVICE</u>

I  hereby certify that on November 13, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Maurice A. Thompson
1851 Center for Constitutional Law
208 E. State Street
Columbus, Ohio 43215
S.Ct. # 0078548
MThompson@OhioConstitution.org

Christopher P. Finney, Esq.
Justin C. Walker, Esq.
Finney Law Firm, LLC
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio 45245
S.Ct.#0038998
S.Ct. #0080001
chris@finneylawfirm.com
Justin@Finneylawfirm.com

/s/ John W. Hust
John W. Hust