**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JAMES RONALD BAKER** *et al.*, | : | **CASE NO. 14-CV-512** |
| | : | |
| **Plaintiffs,** | : | **JUDGE DLOTT** |
| | : | |
| **-vs-** | : | |
| | : | |
| **PORTSMOUTH, OHIO,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION AND ISSUES PRESENTED**

Defendants maintain that they are entitled to summary judgment for a number of reasons: (1) "Inspections are necessary to further the stated purposes of the ordinance, i.e., to protect the public health, safety and welfare of occupants of all rental buildings," as "without inspections to ensure compliance, [ordinances are] essentially worthless and leave tenants at risk of living in dangerous and/or unhealthy conditions"[1] (Defendants do not address the necessity of *government* inspections, or why these inspections, if necessary, are now voluntary); (2) Rental homes are privy to a "closely regulated industry;" and (3) "Both the landlord and the tenant have a diminished expectation of privacy." Defendants further contend that Plaintiffs may not maintain an equitable action against the City for recovery of fees paid by Plaintiffs and others to fund the unconstitutional warrantless searches. For the reasons identified below, and more, each of these contentions lacks merit.

---

[1]    Plaintiffs' November 13, 2014 Motion for Summary Judgment, p. 5.

1

## II.     LAW AND ANALYSIS

As an initial matter, Portsmouth's searches are not entitled to a presumption of constitutionality.  To the contrary, "[w]hen a warrantless search has been conducted, <u>the state bears the burden</u> to establish that the search falls within one of the exceptions to the warrant requirement." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455; *State v. Kessler* (1978), 53 Ohio St.2d 204.  Defendants cannot meet that burden: "an owner's ability to rent his premises may not be conditioned upon his consent to a warrantless inspection of the premises." *People v. Ventura*, 787 N.Y.S.2d 680 (N.Y.Just.Ct. 2004), citing *Colonnade Catering Corp. v. United States,* 397 U.S. 72 (1970)

### A.     Portsmouth has *coerced* warrantless searches.

Defendants suggest that their searches of Plaintiffs' houses, and others, were not coercive because a Portsmouth homeowner who does not consent to a search can avoid the search by "simply" evicting his or her tenants and surrendering the right to rent the homes.  This is a false choice.

First, the Supreme Court affirms that "a search conducted over the objection of the owner of the premises sought to be searched is 'forcible,' whether or not violent means are used to effect the search." *U.S.v.Biswell,*406 U.S. 311, at 319.  And as understood in *Bumper v. North Carolina*, 391 U.S. 543 (1968), "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  Thus, when the state attempts to justify a warrantless search on the basis of consent, the state must demonstrate that the consent was freely and voluntarily given and not the result of coercion, express or implied." *State v. Taylor* 77 Ohio App.3d 223, at 226 (1991).

Applying these principles to a search requirement similar to the one *sub judice*, the Ohio Supreme Court explained, "A valid consent involves a waiver of constitutional rights and cannot be lightly inferred; hence, it must be '<u>voluntary and uncoerced</u>, either physically or psychologically.'" *Wilson v. City of*

*Cincinnati,* 46 Ohio St.2d 138, at 141 (1976), citing *United States v. Fike* (C.A.5, 1972), 449 F.2d 191, 193. Therefore, "where a municipal ordinance requires the owner of real property to tender a certificate of housing inspection to a prospective buyer, and such certificate may be obtained only by allowing a warrantless inspection of the property, the imposition of a criminal penalty upon the owner's *failure to tender the certificate* [separate and apart from his refusal to permit the inspection] violates the owner's rights under the Fourth Amendment to the United States Constitution." Id.

*Second,* it is no defense that Portsmouth's search is *indirectly* rather than *directly* coercive. The Supreme Court has confirmed in a variety of contexts that "government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 545 (1983); see also, *e.g., Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 59–60 (2006); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990); *Perry v. Sindermann,* 408 U.S. 593 (1972). "Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v St. Johns River Water Management Dist.,* 133 S.Ct. 2586, at 2594 (2013).

In 2013, the Supreme Court applied the Unconstitutional Conditions Doctrine within a context akin to here - - land use permitting. *Id*. ("land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits," citing *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 547 (2005); *Dolan,* 512 U.S., at 385). In rental inspection cases such as *Wilson, Sokolov,* and *Dearborn,* the Courts clearly applied this doctrine: in each case, the property owner had the option of avoiding the warrantless inspection by *not* selling or renting his or her property; but in each case, the Court found this to be a coercively false choice.

This choice is particularly false in Ohio, since rather than mere loss of a "government benefit," Plaintiffs' fundamental rights would be denied: "Ohio has always considered the right of property to be a *fundamental right*," as "[t]he rights related to property, i.e., to *acquire, use, enjoy,* and dispose of property,

3

are among the most revered in our law and traditions." *Norwood v. Horney* (2006), 110 Ohio St.3d 353, 361-62 (internal citations omitted); see also *State v. Cline,* 125 N.E.2d 222 ("the free use of property is guaranteed by Section 19, Article I of the Ohio Constitution"); *Smith v. Erie RR. Co.* (1938), 134 Ohio St. 135, 142 ("any substantial interference with the elemental rights growing out of ownership of private property is considered a taking.").

Applying these understandings here, we see that the Rental Dwelling Code is coercive on its face. First, Section 1361.08(C) states "All residential premises within the city of Portsmouth owned for rental purposes or occupied by a party other than the owner . . . <u>shall require a rental dwelling permit</u> from the Portsmouth City Board of Health,"[2] and such permits may only be issues to property owners after the home at issue has undergone a government inspection ("A rental dwelling permit shall be issued by the Code Enforcement Official, <u>if upon inspection of the rental dwelling it is determined that the rental dwelling meets the requirements of this code</u>."). See Section 1361.09(A). Renting one's property without submitting to a warrantless search of the property results in criminal sanction - - "a misdemeanor of the fourth degree," as does any "violation of the [RDC]." Section 1361.18.

*Second*, the City itself certainly viewed and enforced the searches as coercive - - Defendants' correspondence to Plaintiffs characterized the inspections as "mandatory," threatening loss of "permit to operate" and a "misdemeanor," should the inspections not occur: entitled "FAILURE TO SCHEDULE **MANDATORY** RENTAL INSPECTION," the City's correspondence indicates "[the City] has made several attempts to contact you . . . to schedule your required rental dwelling inspection. . . . Failure to respond to this request. . . is a violation of Section 1361.02 of the Rental Dwelling Code. . . <u>Failure to comply with this</u>

---

[2]    "Residential premises" is defined to include the entirety of any rental property: indoors, outdoors, garages, basements, yards, etc. see Section 1361.08(C).

order may result in an order to suspend the permit to operate and/or implement the procedures for Condemnation by the Board of Health. . . . and possible issuance of misdemeanor citation. . ."[3]

Finally, the Summary Judgment evidence before the Court confirms the coercive nature of the RDC searches. First, Plaintiff Ron Baker's Discovery Responses to Defendants explain that, as to whether he or his tenants consented to the searches "For all properties, the tenant gave me oral permission to allow inspection, but only because of the threat by the city to fine me or condemn the property," and further, "None [of the tenants] refused to give me permission once they understood the serious threats the City was making if we did not permit inspection."[4] And as to the threatening nature of the RDC ordinance, Mr. Baker explained "The ordinance itself is threatening: its language is clear that non-compliance is a crime. I also received a letter telling me the actions the city would do if I did not permit inspections."[5]

Portsmouth tenants further confirm the coercive nature of the ordinance: Jennifer Whittier and Judy Reed, who rent from Mr. Oliver testified through affidavit that "I opposed the City's rental inspection of my home, was coerced into allowing it, and would not have permitted it, if I had maintained a choice in the matter," and "The City's rental inspection was an intrusive and inconvenient invasion of my privacy."[6]

While the Defendants downplay the severity of the loss of one's ability to rent his or her houses to others, Plaintiffs Baker and Oliver explain in their affidavits that in 2013 they each earned between $132,000 and $143,000 in gross income on their rentals houses within the Portsmouth city limits, and "Loss of the above rental income would put [them] out of business and cause financial ruin - - that loss would be more harmful than any misdemeanor criminal conviction."[7] This is because nearly all of those funds are dedicated toward paying mortgages, taxes, and insurance - - loss of the ability to rent would result in foreclosures and bankruptcies (and greater vacancies in Portsmouth). Plaintiffs quite understandably

---

[3]    See City of Portsmouth Health Department letter to property owners re: Failure to Schedule Mandatory Rental Inspection, attached to Plaintiffs' Complaint as Exhibit B.
[4]    Response to Defendants' Interrogatory 2(g) and Interrogatory 3.
[5]    Id., at Interrogatory 4.
[6]    November 12, 2014 Declarations of Jennifer Whittier and Judy Reed, Paragraphs 3 and 4.
[7]    See Declarations of Ron Baker and Darren Oliver, Paragraph 6.

consider loss of such income and business *more* punitive than even the harshest misdemeanor conviction.

Thus, the City forced Plaintiffs and their tenants into forfeiting their Fourth Amendment rights by threatening, in response to the exercise of those rights, (1) to withhold newly-required rental permits needed to rent homes in Portsmouth and/or (2) to prosecute Plaintiffs for criminal violations, should they rent their homes without newly-required rental permits. Such indirect coercion is forbidden. Consequently, all law and evidence demonstrates that Portsmouth's searches have been coerced.

**B.    Residential rental houses are not the "stock" of a "closely regulated industry.*"**

The dearth of precedential or logical support for Portsmouth's forced searches of rental houses leaves Defendants making a truly chilling and shocking argument: all homes of all Ohioans who rent are subject to warrantless government intrusion. But because leasing of residential property is not a "closely regulated industry," no exception to the warrant requirement for administrative searches applies.

The Sixth Circuit recognizes only one finite exception to the warrant requirement for administrative searches that could even remotely be viewed as applicable here: "as to searches conducted of 'closely regulated' industries, a legislative scheme may serve as a substitute for a warrant." *Id.*, citing *Donovan v. Dewey*, 452 U.S. 594, 603 (1981).

In *Donovan,* the Supreme Court held that in certain limited situations, warrantless administrative searches of commercial property do not violate the fourth amendment. This Circuit has characterized these exceptions under the rationale of "the notion of implied consent." *Dow Chemical Co.,* 749 F.2d at 311, n. 1; *see also, Barlow's, Inc.,* 436 U.S. at 313. However, since this form of search is an exception to the warrant requirement, the burden of proof rests with the party asserting the exception. *See Barlow's, Inc.,* 436 U.S. at 324. Even in *that* context, "before this court will determine whether or not a warrantless inspection is constitutionally acceptable, the government must first overcome the presumption of unreasonableness by showing that the owner has weakened or reduced privacy expectations that are significantly overshadowed

by government interests in regulating the particular industry or industries." *McLaughlin v. Kings Island,* 849 F.2d 990 (6th Cir. 1988).

> **i.**     ***Precedent demands that the "closely regulated" exemption be strictly limited.***

The rationale for the pervasively regulated industry exception to the warrant requirement could not apply here: it stems from the fact that those "industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Barlow's,* 436 U.S. at 313, (citation omitted). However, "*the pervasively regulated industry exception is limited,* and indeed the exception, as [even] industries affected by OSHA regulation are not by definition pervasively regulated." *Barlow's,* 436 U.S. at 315 ("The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents.").[8]

This is exception is so finite that in 1995, the Sixth Circuit expressed that "[t]o date the Court has identified four such closely regulated industries: the liquor industry, the firearms industry, the mining industry, and the vehicle dismantling industry." *Id*. (Of note, in *McLaughlin v. Kings Island*, the Sixth Circuit also included pharmacies). In 2003, the Circuit affirmed that even "sexually oriented businesses do not qualify as highly regulated industries." *Deja Vu of Cincinnati, L.L.C. v. Union Tp. Bd. of Trustees*, 326 F.3d 791 (6th Cir. 2003), citing 49 F.Supp.2d at 1040 (relying primarily on the fact that the Supreme Court has never reached such a conclusion, and citing *Burger,* 482 U.S. at 700–01). And in 1987, the Circuit concluded that the state had failed to meet its burden of demonstrating that bee apiaries were "closely regulated," explaining that "less than 100 percent of beekeepers in Ohio are registered, and only about 85 percent of those registered are inspected every year." *Allinder v. State of Ohio*, 808 F.2d 1180 (6th Cir. 1987).

---

[8]     Similar to a delegation of access to employees, a landlord's delegation of access to his tenants is not without limits, and does not contemplate government intrusion, particularly for an expansive and detailed examination of every corner of the leased premises.

Indeed, within the past year, the Ninth Circuit, *en banc,* concluded that "no serious argument can be made that *the hotel industry* has been subjected to the kind of pervasive regulation that would qualify it for treatment under the *Burger* line of cases." *Patel v. City of Los Angeles,* 738 F.3d 1058 (9th Cir. 2013). And if hotel room owners and itinerant guests are not subject to pervasive regulation, then, *a fortiori,* permanent private residences are not pervasively regulated.

At the end of the day, Defendants themselves are forced to admit "The issue of whether the closely regulated business exception applies to residential rental property appears to be a case of first impression. Counsel was unable to locate any case holding that the closely regulated business exception does not apply to residential rental property."[9] But Defendants didn't look hard enough - - in cases to have directly considered the issue, courts have observed that the business of residential rental is not closely regulated: "Nor may it be said that the business of residential rental is of such a nature that consent to a warrantless administrative search may be implied from the choice of the appellants to engage in this business." *Sokolov v. Village of Freeport*, 52 N.Y.2d 341 (1981), Footnote 1.

### ii.    *"Houses" and "homes" are afforded greater, not less, protection.*

While Defendants suggest that several *District* courts within this Circuit have indicated in dicta that convenience stores, barber shops, and pet shops *may* be "closely regulated,"[10] none of these cases attempt to stand for the untenable proposition that private residences are therefore "closely regulated" as well. And even then, each of these decisions was pre-*Jones*. However, the term "houses," unlike the terms "factories," "offices," "pet stores," or "convenience stores," is specifically delineated in the Fourth Amendment. *Secondly,* rental houses are *private residences* when occupied, and still "houses," even when unoccupied. Therefore, warrantless entries by government, without consent, must be constricted *moreso* than traditional commercial property, not *less* so, as Defendants suggest.

To this end, Supreme Court Justices have *specifically* concluded as follows:

---

9       Defendants' November 13, 2014 Motion for Summary Judgment, p. 19.
10      See Defendants' Motion for Summary Judgment, p. 7.

> The administrative-inspection cases are inapposite to a search of a home. Each of the cases that this Court has found to fall within the exception to the administrative-warrant requirement has concerned the lesser expectation of privacy attached to a 'closely regulated' business . . . The reasoning that may justify an administrative inspection without a warrant in the case of a business enterprise simply does not extend to the invasion of the special privacy the Court has recognized for the home.

*Griffin v. Wisconsin,* 483 U.S. 868 (1987) (Justices Blackmun, Marshall, Brennan, and Stevens, dissenting on other grounds than those quoted). In recognition of this understanding, federal courts have observed that "it is seriously doubtful that Congress could authorize Constitutionally permissible warrantless entries into private residences to further a strong interest in regulating a prohibited activity." *U.S. v. Hall,* 47 F.3d 1091(11th Circ. 1995). Plaintiffs' Motion for Summary Judgment more fully chronicle Court's special treatment of houses for Fourth Amendment purposes.

Defendants argue as though the term "house" does not appear in the Fourth Amendment, and as though protection against government trespass is not at its apex when applied to private residences. Under Defendants' conception of the Fourth Amendment, crack-houses and adult cabarets would receive greater constitutional protection than rental houses, as would factories, warehouses, offices, and retail stores. This is even though, unlike places of commercial business, the public is not invited into rental homes.

Governing law further demonstrates that Defendants' view is distorted: the Supreme Court holds that "a warrant is generally required for a search of a home." *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313 (1972). "And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the Court has recognized, as 'a basic principle of Fourth Amendment law, that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Payton v. New York,* 445 U.S., at 586.

### iii. *Defendants' reasoning would render <u>all</u> Ohio houses "closely regulated."*

Defendants' reasoning would render warrants unnecessary to search nearly every Ohio home, and the Fourth Amendment a nullity. Defendants contend that "Rental of residential property is a closely regulated business," because "Chapter 5321 closely regulates: (1) the contractual relationship between the landlord and tenant, including permissible and impermissible terms of that relationship; (2) the obligations of the landlord to keep the property in a fit and habitable condition; (3) rent withholding procedures; and (4) retaliatory conduct of the landlord. In addition, the Act requires a landlord to comply with the rights of tenants under the Servicemembers Civil Relief Act..."[11]

However, whether an industry's property is "closely regulated" is not simply a matter of whether there are regulations. Were this true, every house in Ohio would be subjection to warrantless government trespass. Is your house subject to zoning regulation?[12] Maybe even in a planned community?[13] Subject to Property taxation?[14] Does your house have a mortgage?[15] Did you buy your house on land contract?[16] Is your house in a township?[17] Is your house in a municipality?[18] Have you *bought* your house?[19] Are you trying to *sell* it?[20] If any one or more of these applies to you, Defendants' reasoning dictates that your house is pervasively regulated, and no warrant is required for government agents to enter and perform a general search.

---

[11]     Defendants' November 13 Motion for Summary Judgment, p. 8.
[12]     R.C. 1345 *et seq.*, R.C. 1707 *et seq.*
[13]     R.C. 5312 *et seq.*
[14]     R.C. 5705 *et seq.* through R.C. 5721, *et seq.*
[15]     R.C. 5301 *et seq.*, R.C. 1303 *et seq.*, R.C. 1321 *et seq.*
[16]     R.C. 5301 *et seq.*, R.C. 5313 *et seq.*
[17]     Ohio law empowers townships to employ specified methods of taxation to raise money to pay for police and fire service (R.C. 505.51 and 505.39), parks (R.C. 511.27 and 511.33), and roads (R.C. 5571.15, 5573.07, 5573.10, 5573.11, and 5573.211). R.C. 504.13 applies building codes.
[18]     R.C. 713, 715 *et seq.*, R.C. 3781 *et seq.*
[19]     R.C. 5309 *et seq.*
[20]     R.C. 1345, *et seq.*

Nevertheless, Defendants ask this Court to lead the way in ushering in this sweeping new understanding of the Fourth Amendment whereby every home is subjected to warrantless government intrusion - - the very phenomena that the Amendment was enacted to stop. Moreover, by virtue of Defendants' reasoning, state and local governments would be able to defeat the protections of the Fourth Amendment simply through enacting additional regulations on houses and homes.

Finally, the real-world implications of Defendants' analysis are disconcerting, to say the least: Defendants ask this Court to create second-class citizens - - the millions of Ohioans who are tenants. According to Defendants, Ohioans who do not own a home are not entitled to their Fourth Amendment rights, and may have their homes invaded without a warrant. Lost in this elitist portrayal is the reality that not everyone is in a position to buy his or her own home, and thus re-purchase the Fourth Amendment rights that are supposed to be guaranteed, irrespective of economic status or lifestyle choice.

Meanwhile thousands of Ohioans own residential rental property, and do so without having to acquire a license or pass a test. Many simply rent out a home that they have inherited or previously lived in, rather than selling it, and do so in their own names, rather than through an elaborate business enterprise. Consequently, such a business cannot be said to be "closely regulated," so that any exception to the administrative warrant requirement applied. Thus, Plaintiffs are entitled to summary judgment as a matter of law: no exception to the warrant requirement existed when Defendants imposed searches on Plaintiffs.

### iv.      Even if private rental homes were closely regulated, Portsmouth's searches would fail scrutiny.

Even if this Court were to assume that private residences are everywhere and always "the stock of pervasively regulated businesses," the RDC would not satisfy the criteria for warrantless administrative searches. This is because warrantless inspections of a pervasively regulated business *still* violate the Fourth Amendment unless the following three requirements are met: "(1) there is a substantial government interest which informs the regulatory scheme pursuant to which the search is made; (2) the warrantless inspections

are necessary to further the regulatory scheme; and (3) the statute's inspection program, in terms of certainty and regularity of its application, provides an adequate substitute for the warrant requirement." *Term Auto Sales, Inc. v. City of Cleveland,* No. 94–3088, 1995 WL 308988 (6th Cir. May 18, 1995)(citing *Donovan v. Dewey,* 452 U.S. 594 (1981).

The Program fails each of these requirements; however it suffices to analyze just the second prong: "necessity". On this front, Defendants contend that "[t]he second requirement of Burger is that warrantless inspections must be necessary to further the regulatory scheme. Absent periodic scheduled inspections, the City will be severely limited in its ability to effectively enforce its property maintenance code with reference to rental properties."[21] This contention is nothing more than a policy argument. And one divorced from bright-line Supreme Court and Sixth Circuit precedent.

In *Hodgins v. U.S. Dept. of Agriculture*, the Sixth Circuit explained that to meet the second criterion-the necessity for *warrantless* inspections-the agency must show a need for "surprise." *Hodgins v. U.S. Dept. of Agriculture*, 238 F.3d 421 (6th Cir. 2000); *Cf. Marshall v. Barlow's, Inc.,* 436 U.S. 307, 316-17 (1978). "In *See v. City of Seattle,* the mission of the inspection system was to discover and correct violations of the building code, conditions that were relatively difficult to conceal or to correct in a short time. Periodic inspection sufficed, and inspection warrants could be required and privacy given a measure of protection with little if any threat to the effectiveness of the inspection system there at issue." *Id.* In *Hodgins,* the Sixth Circuit explained "for warrantless searches to be justifiable under a regulatory scheme, the object of the search must be something that can be quickly hidden, moved, disguised, or altered beyond recognition, so that only a surprise inspection could be expected to catch the violations. On the other hand, if a regulation is similar to a building code (as in *See v. Seattle*), where violations will be harder to conceal, the need for surprise will be less pressing, and warrantless searches will more likely be unconstitutional." *Hodgins v.*

---

[21]     Defendants' Motion for Summary Judgment, p. 15.

*U.S. Dept. of Agriculture*, 238 F.3d 421 (6th Cir. 2000), citing *McLaughlin v. Kings Island,* 849 F.2d 990 (6th Cir. 1988).

Here, the warrantless search is for violations of the City's Property Maintenance Code, clearly tantamount to a building code. Further, the element of "surprise" is already lacking, since the City attempts to schedule these inspections well in advance of their actual date. Moreover, the only method for a property owner to "conceal" the conditions would be to remedy them, thus obviating the very need for the search.

Finally, Defendants further fail to carry their burden because their policy argument lacks coherence: they provide no reason why private inspections by *certified private inspectors*, rather than *government* inspectors, would fail to sufficiently achieve the goals of the Rental Dwelling Code. Indeed, Defendants cite with approval to cases where private, rather than government, inspectors are utilized to conduct rental searches, and they are therefore aware that the imposition of a *government* intrusion is not "necessary" to guarantee the quality and safety of the local housing stock. See *Marcavage v. Borough of Landsome,* 911 F.Supp. 155 (3rd Circ. 2012)( "if the property owner does not wish to consent to an inspection by a city official, the Ordinance provides him with an opportunity to select a licensed architect or engineer of his choice to conduct the inspection and submit a report to the City. . ."). One gets the sense that the City is simply wedded to the fees that inure from insisting on conducting the inspections itself.

Consequently, even if Plaintiffs' rental houses were to be considered part of a "closely regulated industry" (and they cannot be), the City's search requirement would fail to meet the requirements for a warrantless search.

**C.      Both Landlords and Tenants maintain Fourth Amendment rights.**

Defendants next defend the warrantless searches of houses by arguing that "[b]oth the landlord and the tenant have a diminished expectation of privacy."[22] On this front, Defendants essentially posit that because landlords retain a contractual right to enter the property when necessary, tenants have no right to

---

[22]      Defendants' Motion for Summary Judgment, p. 12.

insist on a warrant before *government* searches their home; and conversely, because tenants retain an implicit contractual right to invite house guests over, the homeowner has contracted away his Fourth Amendment rights. To make their point, Defendants cite to dated Sixth Circuit precedent for the proposition that, generally and without more, landlords lack a reasonable expectation of privacy sufficient to maintain standing to challenge a government search of rental property.

For a number of reasons, Defendants' contentions are both false and beside the point. First, Defendants rely on precedent prior to the United States Supreme Court's 2012 clarification of the test governing Fourth Amendment guarantees in *United States v. Jones.* The Court clarified that the Amendment is first and foremost a protection of property, including "houses," against government trespass. Thus, a straight-forward application of the *Katz* "reasonable expectation of privacy" test is inappropriate here because that test is *in addition to* the Fourth Amendment's property-related protections that apply here: the reasonable expectation of privacy test applies in situations where there is *no* property right, as opposed to here. As the Court explained, "Fourth Amendment rights do not rise or fall with the *Katz* formulation" (the "reasonable expectation of privacy" test). And The *Katz* reasonable-expectation-of-privacy test has been added to, but not substituted for, the common-law trespassory test." *Jones*, supra. (Syllabus)(*Katz* added to the baseline the "expectations" test where no intrusion on property takes place, *Katz* "does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.") To this end, the Supreme Court explains <u>"[w]e [do not] believe that *Katz,* by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home.</u>" *Alderman v. United States*, 394 U.S. 165, 176 (1969).

Applying the Supreme Court's paradigmatic illuminations in *United States v. Jones,* the Ninth Circuit Court of Appeals recently concluded, *en banc*, that where a hotel owner maintains "a possessory and an ownership interest," "by virtue of those property-based interests," it has the right to exclude government

searches. The hotel's property and privacy interests are more than sufficient to trigger Fourth Amendment protection. As to the property-based rationale for our holding, which is grounded in a century-old line of Supreme Court precedent beginning with *Hale,* 201 U.S. at 76–77, the dissent is in complete agreement." *Patel v. City of Los Angeles,* 738 F.3d 1058 (9th Cir. 2014).

The Court further clarified that "[w]e do not believe business owners are required to prove that [their property is subject to a reasonable expectation of privacy], any more than homeowners are required to prove that papers stored in a desk drawer are subject to a reasonable expectation of privacy. So long as a business's records are 'private,' as the Court held in *Hale,* 201 U.S. at 76, they fall within the scope of the 'papers' protected by the Fourth Amendment." *Id.* The Court then concluded that "No one contests here that plaintiffs' hotel records are in fact private. . . if the records were publicly accessible, the police of course would not need to rely on [the local warrantless search ordinance at issue] to gain access to them." *Id.*

Likewise here, Plaintiffs' "houses" are indisputably private: they are not "publicly accessible," and cannot be accessed by the general public in the same way that a retail store during business hours can be accessed. This is the very reason, that Portsmouth passed the Rental Dwelling Code - - to force access to private property without consent. Thus, Defendants are mistaken to rest their advocacy of warrantless house searches solely on presence or absence of property owners' expectations.

*Second*, Plaintiffs' position here is highly distinguishable from that of a landlord in a run-of-the-mill case featuring a criminal search for or of another on rental property he or she owns: here, it is *the Plaintiff-homeowner* who is the target of the search, it is the Plaintiff-homeowner who is subjected to potential criminal liability in relation to the search, and it is Plaintiff-homeowner who is faced with loss of property rights and financial ruin if the searches are not performed.[23] Moreover, it is Plaintiff-homeowner, and not the tenant, who is forced to consent to the search.

---

[23]    Defendants' argument is only relevant to the end of whether Plaintiffs' maintain *standing* to challenge the searches; because they were threatened with and harmed by the searches, they do indeed maintain a concrete interest in the determination of the searches' constitutionality.

For these reasons, "*Camara* makes no distinction between owner and tenant, but rather holds that an administrative search of a private residence, including a private residence owned by one person and rented by another, must include a warrant procedure. . . *the property owner is being penalized for his failure to consent in advance to a warrantless search.*" *Dearmore v. City of Garland*, 400 F.Supp.2d 894, at 902 (N.D. Tex. 2005)(reasoning approved by the First Circuit on appeal). The landlord's rights are implicated because "[t]he alternatives presented to the property owner are to consent in advance to a warrantless inspection, or to face criminal penalties; thus consent is involuntary. On the other hand, if the owner does not consent to the warrantless search, he does not receive a permit. The whole purpose of receiving a permit is to rent the property for commercial purposes. Without a permit, the owner cannot engage in lawful commercial activity. The owner is thus faced with equally unavailing situations." *Dearmore,* supra., at 902.

*Third*, even through the lens of the reasonable expectation of privacy test, Plaintiffs' rights are implicated because Defendants frequently search their houses while those houses are un-leased and vacant. Mr. Baker and others verified during their depositions that their houses were searches while vacant, a condition in which they exercised full dominion over them.[24]    *Dearmore,* supra., at 902. ("The court determines that in order to comply with the requirements of *Camara* and the protections of the Fourth Amendment, the Ordinance must give the landlord the opportunity to refuse to consent if the property is unoccupied and include a warrant procedure to be followed in the event the landlord refuses.")

*Fourth*, Plaintiffs' tenants clearly maintain a reasonable expectation of privacy in their homes. See *McDonald v. United States* (1948) 335 U.S. 451. Plaintiffs hereby raise that interest on behalf of Portsmouth tenants Jennifer Whittier and Judy Reed. Each is a tenant of Plaintiff Darren Oliver, and each thoroughly articulated their opposition to the searches of their Portsmouth homes through submission of their November

---

[24]    See Ron Baker's Declaration, Paragraph 12, indicating "There are times when one or more of my rental properties in Portsmouth is vacant; and during those periods of time, I have complete dominion and control over those properties."

2014 affidavits. Tenants' privacy rights should not be overlooked, as Plaintiffs will move to amend their Complaint to add each tenant as a Plaintiff, pursuant to Fed. R. Civ. P. 15(B).

*Finally*, Defendants' contention must be placed in proper perspective: Defendants contend that neither the owner nor the tenant of a house may assert a Fourth Amendment right in response to the warrantless search of a rental house. Defendants would thus have this Court remove constitutional protection for perhaps half or more of all Ohioans' homes. This is not the law, and nor should it be.

### D. Plaintiffs are entitled to Restitution.

Defendants asserts that "[u]nder Ohio law, the City, as a political subdivision of the State, cannot be bound under a theory of implied, or quasi-contract such as unjust enrichment," and "[i]n addition, the City is immune from any liability under chapter 2744 of the Revised Code for its actions in performing a governmental function such as enforcing building ordinances."[25] Further, Defendants contend that applicable Ohio law does not apply because "here, Plaintiffs seek damages from the Defendants individually."

Defendants' arguments entirely miss the point: "restitution has been available both in equity and in law as the remedy for an unjust enrichment of one party at the expense of another. * * * Several remedies are available to a litigant seeking restitution, including a judgment for money." *Santos v. Ohio Bur. of Workers' Compensation*, 101 OhioSt.3d 74, 2004-Ohio-28.

In *Santos*, the Ohio Supreme Court, explained that restitution is appropriate an appropriate method "to restore to the plaintiff particular funds or property in the defendant's possession," quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002). Santos' complaint argued that R.C. 4123.931 was unconstitutional (the statute was indeed found unconstitutional), and he sought "appropriate injunctive relief, and . . . an award of attorney fees, litigation expenses and court costs." *Santos,* supra. On this basis, Santos asserted that "his claim for the return of funds wrongfully held by the state is an equitable action, namely restitution, by which he seeks to make the members of the aggrieved class whole," while the

---

[25]     Defendants' Motion for Summary Judgment, p. 20.

state responded, essentially as Defendants do here, arguing that "the money sought represents damages for injuries and is not simply reimbursement of funds. The BWC submits that further weight is added to its position because Santos also seeks attorney fees and litigation and court costs." *Id.*

However, the Court concluded "[w]e find the BWC's arguments unpersuasive," because "restitution has been available both in equity and in law as the remedy for an unjust enrichment of one party at the expense of another. * * * Several remedies are available to a litigant seeking restitution, including a judgment for money," and "[a]lthough ordinarily such money judgment is obtained by an action at law, a decree for money will sometimes be rendered by a court of equity." *Id*., citing Restatement of the Law, Restitution (1937) 9, 21.

The Court further explained that "[t]his court has employed similar reasoning to hold that <u>equitable restitution may include the recovery of funds wrongfully held by another</u>," including a conclusion that, "[t]he order to reimburse Medicaid providers for the amounts unlawfully withheld is not an award of money damages, but equitable relief." Id., citing *Ohio Hosp. Assn. v. Ohio Dept. of Human Serv*. (1991), 62 Ohio St.3d 97, at 104.

In *Ohio Hosp. Assn*, as Defendants attempt to do here, the state "argued that the Court had no jurisdiction over the matter because the state did not waive its immunity from liability for money damages resulting from an invalidated administrative rule." *Id*. But the court disagreed, concluding that "<u>[t]he reimbursement of monies withheld pursuant to an invalid administrative rule is equitable relief</u>, not money damages, and is consequently not barred by sovereign immunity." *Ohio Hosp. Assn.,* supra., at 105.

Similarly, in *Judy v. Ohio Bur. of Motor Vehicles,* a class of individuals sought injunctive relief and reimbursement from the Ohio Bureau of Motor Vehicles ("BMV") in a court of common pleas, seeking return of driver's license fees that it argued the BMV had unlawfully assessed. 100 Ohio St.3d 122, 2003-

Ohio-5277.[26]    The court concluded that this action simply "sought injunctive relief and simple reimbursement of the allegedly improperly assessed fees," rather than money damages. *Id.*

Each of these Ohio Supreme Court simply apply *federal* law demonstrating that Plaintiffs are entitled to equitable relief in restitution for their Rental Dwelling Code inspection fees.  The United States Supreme Court, in *Great–West Life & Annuity Ins. Co. v. Knudson,* explained "Restitution is available as a *legal* remedy when a plaintiff cannot "'assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him,'" and  "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." (2002), 534 U.S. 204, quoting Dobbs, Law of Remedies (2d Ed. 1993) 571, Section 4.2(1).

Here, Plaintiffs' Complaint articulates a viable claim for restitution[27] because,  through its inspection and permitting fee assessments, the City of Portsmouth has acquired funds rightfully belonging to Plaintiffs and others, and these funds were acquired for the sole purpose of performing unconstitutional searches of Plaintiffs' properties.    Accordingly,  so  long  as  this  Court  concurs  that  Portsmouth's  warrantless  searches  were unconstitutional, then it should also conclude that Plaintiffs' forced underwriting of those searches was unconstitutional, and that a refund is owed.   In this sense, Plaintiffs' claim for a refund is utterly indistinguishable from the claims in *Santos, Ohio Hospital Association, and Judy.*

## III.    Conclusion

Accordingly, (1) searches of Plaintiffs' houses require a warrant, (2) Plaintiffs' may not be coerced, directly or indirectly, into surrendering their right to demand a warrant prior to a search of their home; (3) Plaintiffs and their tenants maintain standing to address the City's warrantless searches; (4) the "closely regulated" exception to this rule does not apply; (5) even if that exception applied, the Rental Dwelling Code

---

[26]    BMV had improperly interpreted two Revised Code sections and as a result had improperly collected double license reinstatement fees. The return of the improperly collected fees is analogous to the return of inspection fees collected here. In both cases, the plaintiffs sought the return of specific funds improperly collected by a government agency.
[27]    Plaintiffs' Verified Complaint, Paragraphs 128-135.

wouldn't suffice to facilitate warrantless searches; and (6) Plaintiffs are entitled to restitution because Plaintiffs have been wrongfully assessed by Defendants, and Defendants unjustly enriched through keeping funds charged to underwrite unconstitutional searches.

Plaintiffs are thus entitled to summary judgment, as a matter of law, on their Fourth, Fifth, and Fourteenth Amendment claims related to forced warrantless searches, and also for their claim for restitution as to fees extracted to fund the unlawful searches.


Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
208 E. State Street
Columbus, Ohio 43215
Tel: (614) 340-9817
Fax: (614) 365-9564
MThompson@OhioConstitution.org

Justin C. Walker (0080001)
Christopher Finney (0038998)
Finney Law Firm, LLC
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio 45245
(513) 943-6660 phone
(513) 943-6669 fax
*Justin@Finneylawfirm.com*
*Chris@Finneylawfirm.com*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Partial Summary Judgment have been served on Defendants, through email to Portsmouth Counsel John Hust, on December 15, 2014.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)